IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DANIEL BARTHOLOMEW CLARK #194417, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:16-cv-403-WHA-WC |
| | ) | [WO] |
| | ) | |
| LEEPOSEY DANIELS, WARDEN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.    INTRODUCTION[1]

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Daniel Bartholomew Clark ("Clark" or "Plaintiff"), a state inmate, in which he challenges conditions present during his prior term of incarceration at the Staton Correctional Facility. Specifically, Clark alleges that the defendants denied him adequate medical treatment for injuries received in an altercation with fellow inmates on May 9, 2016. (Doc. 1 at pp. 2–5.)  More specifically, he alleges that the medical provider defendants refused to respond to his sick call requests and grievances, failed to treat his purportedly broken teeth, failed to remove the stitch from his lip and failed to provide him with pain medications.   He also alleges that Dr. Herring and Nurse Lyndia Likely were responsible for his placement in a holding cell between May 13, 2016 and May 16, 2016, which had no access to a toilet,

---

[1] All documents and attendant page numbers cited herein are those assigned by the Clerk in the docketing process.

lights, water or a bed.  Finally, Clark contends that the correctional officials were deliberately indifferent for failing to protect him from attack by fellow inmates on May 9, 2016, and were deliberately indifferent to the conditions of his cell between May 13, 2016, and May 16, 2016.  Clark names as correctional defendants, Leeposey Daniels and John Crow, wardens at Staton; and Jarmal Sewell, Anthony Wineberg, Terrance Calvin, Jacob Park, William Tate, Phillip Hill, Aaron Tillman, Daniel Grecu, David Wingrove, Travis Ivey, correctional officers at Staton.[2]  He also names as defendants, medical providers including Dr. Ronnie Herring, Medical Director at Staton Correctional Facility; Michele Sager-Copeland, Health Services Administrator at Staton; and Myra McVay, Jannaye Talley, Tara Parker, Lyndia Likely, Charlene DeJarnett, and Cebria Lee, nurses employed by Corizon Health, Inc.  Clark seeks monetary damages for the alleged violations of his constitutional rights.  (Doc. 1 at p. 6; Doc. 30 at pp. 1–5.)

The defendants filed special reports and relevant evidentiary materials in support of their reports, including affidavits and certified copies of Clark's medical records, addressing the claims raised in the complaint, as amended.  In these documents, the medical and correctional defendants maintain they did not act with deliberate indifference to Clark's medical needs and the correctional defendants deny they subjected Clark to unconstitutional conditions.

After reviewing the special reports filed by the defendants, the court issued an order on October 13, 2016, directing Clark to file a response to each of the arguments set forth

---

[2] Clark sues Sewell in his official and individual capacities.  All other correctional defendants are named specifically in their individual capacity or their capacity is not named.

by the defendants in their reports, supported by affidavits or statements made under penalty of perjury and other evidentiary materials.  (Doc. 56 at 2–3).  The order specifically cautioned that "**unless within ten (10) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law."  (Doc. 56 at 3).  Clark filed a sworn response to this order on December 7, 2016.  (Doc. 59).

Pursuant to the directives of the order entered on October 13, 2016, the court now treats the defendants' report as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the defendants.

## II.    FACTS

On May 9, 2016, at about 4:45 p.m., Clark was discovered by Correctional Lieutenant Jarmal Sewell lying on the floor in Dorm D with injuries to his head and facial area.  At about 5:10 p.m. on May 9, he was seen in the Health Care Unit for treatment.  (Doc. 51-1 at p. 2).  Dr. Herring examined Clark and found him "unresponsive and identified significant head trauma with bilateral hematomas (collection of blood) over and around his eyes."  (Doc. 55-1 at ¶ 7).  Dr. Herring ordered Clark to be transported via ambulance to Jackson Hospital emergency room for treatment.  *Id.*  Clark left Staton for Jackson Hospital by ambulance about 5:25 p.m.  He was treated at Jackson and returned

the Staton about 10:30 p.m. on May 9.  Upon his return, he was examined by a nurse at Staton and it was noted that he was awake, and his vital signs were stable. (Doc. 55-1 at ¶ 10).  He was assigned to bed number 17 in the medical observation unit and the correctional staff placed a hold on Mr. Clark for his personal safety following the altercation.  *Id.*   Clark was checked by the nursing staff at least three times during the night of May 9.  (Doc. 55-1 at ¶ 11).

On May 10, 2016, Dr. Herring entered an order for Clark to receive acetaminophen codeine at 300 mg twice a day for three days and ibuprofen (Motrin) at 400 mg three times a day for seven days.  (Doc. 55-1 at ¶ 12).  On May 11, 2016, he was examined by a nurse and it was noted that his face and eyes were still swollen.  (Doc. 55-1 at ¶ 12).  On May 13, 2016, Clark's condition had "improved significantly" and he was moved to a holding cell off a hallway in the Staton health care unit.  (Doc. 55-1 at ¶ 15).  On May 14, 2016, he was examined by a nurse and he was found to be "calm and cooperative".   He was "alert and oriented and his breathing was even ad unlabored".  (Doc. 55-1 at ¶ 16).  On May 16, 2016, Clark was transferred from Staton to Draper.  Prior to his transport, a Staton nurse performed a body chart on Clark.  It was noted that Clark had "multiple healing abrasions with scabs on his back and shoulder.  There was swelling and bruising around both of his eyes . . . and scabs in his nasal area."  (Doc. 55-1 at ¶ 17).

An investigation of the May 9, 2016 incident concluded that Clark, who was under the influence of a narcotic, approached several inmates and threatened to beat them if they said anything to him.  Clark approached inmate Goodwin and swung at him with his right

hand.  Clark and Goodwin started fighting and inmate Young also joined in the fight against

Clark.  (Doc. 51-1 at p. 2).

## III.   DISCUSSION[3]

### A.   Absolute Immunity — Correctional Defendants

To the extent Clark lodges claims against the correctional defendants in their official

capacities and seeks monetary damages, these defendants are entitled to absolute immunity.

Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against

the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  As the Eleventh Circuit has

held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by
> private parties against States and their agencies [or employees]. There are
> two exceptions to this prohibition: where the state has waived its immunity
> or where Congress has abrogated that immunity. A State's consent to suit
> must be unequivocally expressed in the text of [a] relevant statute. Waiver
> may not be implied. *Id*. Likewise, Congress' intent to abrogate the States'
> immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks

and citations omitted).  Thus, a state official may not be sued in his official capacity unless

the state has waived its Eleventh Amendment immunity, *see Pennhurst State School &*

*Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's

immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

---

[3] The court limits its review to the allegations set forth in the complaint, as amended.  (Docs. 1, 30). *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Sec'y, Fla. Dep't of Corr.*, 502 F. App'x. 905, 909–10 (11th Cir. 2012) (holding that plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton Cty. Sch. Dist.*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (refusing to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

> Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14.  The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh,* 438 U.S. 781, 782 (1978) (consent is prohibited by the Alabama Constitution). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir. 1990)).  In light of the foregoing, defendant Jarmal Sewell, and any other defendants whom Clark seeks to sue in their official capacities, are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

### B.      Deliberate Indifference Generally

The law is well-settled that establishment of both objective and subjective elements are necessary to demonstrate a violation of the protections afforded by the Eighth Amendment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed]. Second, once it is established that the official [was] aware of this substantial risk, the

official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh v. Butler Cnty. Ala.,* 268 F.3d 1014 at 1028–29 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp v. Twombly,* 550 U.S. 544 (2007).  As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  . . .  [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 837–38 (1994); *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . .  It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind.""' *Farmer*, 511 U.S. at 834–38, 114 S. Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324–25, 115 L. Ed. 2d 271 (1991). . . .  Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious

harm exists - and the prison official must also "draw that inference." *Farmer*,
511 U.S. at 837, 114 S. Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). A defendant's subjective

knowledge of the risk must be specific to that defendant because "imputed or collective

knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each

individual Defendant must be judged separately and on the basis of what that person [knew

at the time of the incident]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008).

Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere

possibility before a [state official's] failure to act can constitute deliberate indifference."

*Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation

marks omitted). Thus, "[m]erely negligent failure to protect an inmate from attack does

not justify liability under section 1983." *Id*.

### C.    Deliberate Indifference to Medical Needs.

Clark alleges that the medical defendants acted with deliberate indifference to his

medical needs when they denied him adequate medical treatment for injuries received in

an altercation with fellow inmates on May 9, 2016. (Doc. 1 at pp. 2–5). More specifically,

he alleges that the medical provider defendants refused to respond to his sick call requests

and grievances, failed to treat his purportedly broken teeth, failed to remove the stitch from

his lip and failed to provide him with pain medications. Furthermore, to the extent Clark

can be understood to complain that the correctional defendants, as wardens or correctional

officers, are responsible for ensuring that he receive appropriate medical treatment, the

court will also address these arguments. (Docs. 1 and 30).  These assertions entitle Clark

to no relief.

### 1.      Standard of Review.

> That medical malpractice—negligence by a physician—is insufficient to
> form the basis of a claim for deliberate indifference is well settled. *See Estelle
> v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976);
> *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995).  Instead, something
> more must be shown.  Evidence must support a conclusion that a prison
> [medical care provider's] harmful acts were intentional or reckless. *See
> Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128
> L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir.
> 1996) (stating that deliberate indifference is equivalent of recklessly
> disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at
> 1543 (stating that plaintiff must show more than mere negligence to assert an
> Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention
> Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme
> Court has defined "deliberate indifference" as requiring more than mere
> negligence and has adopted a "subjective recklessness" standard from
> criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating
> "deliberate indifference" is synonym for intentional or reckless conduct, and
> that "reckless" conduct describes conduct so dangerous that deliberate nature
> can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . . ,

Plaintiff[] must show: (1) a serious medical need; (2) the defendant['s] deliberate

indifference to that need; and (3) causation between that indifference and the plaintiff's

injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).  When seeking

relief based on deliberate indifference, an inmate is required to establish "an objectively

serious need, an objectively insufficient response to that need, subjective awareness of facts

signaling the need and an actual inference of required action from those facts." *Taylor v.

Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248,1255

(11th Cir. 1999) (holding that, for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the response made by [the defendants] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted).  To proceed on a claim challenging the constitutionality of medical care, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment." *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986).

In addition, "to show the required subjective intent . . . , a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things[:] awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate

a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. When medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent." *Massey v. Montgomery Cty. Det. Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe*, 888 F.2d 783, 787 (11th Cir. 1989)]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop*, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop*, 871 F.2d at 1033 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). "[A]s *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (citation and internal quotation marks). To show deliberate indifference, the plaintiff must demonstrate a serious medical need and then must establish that the

defendant's response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (citation and internal quotation marks omitted); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (holding that "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient); *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) (holding that defendant's "denial of plaintiff's request to see an outside specialist . . . did not amount to deliberate indifference."); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate indifference" as the allegation does "not show that defendant knowingly disregarded a serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm.").

　　2.　　Medical Defendants.

Clark asserts that the medical defendants denied him adequate medical treatment for injuries received in an altercation with fellow inmates on May 9, 2016. (Doc. 1 at pp. 2-5). More specifically, he alleges that the medical provider defendants refused to respond

to his sick call requests and grievances, failed treat his purportedly broken teeth, failed to remove the stitch from his lip and failed to provide him with pain medications.

The medical defendants adamantly deny they acted with deliberate indifference to Clark's medical needs during the time relevant to this complaint or at any other time. Instead, these defendants maintain that following the altercation on May 9, 2016, the Staton medical staff prescribed pain medications for him, treated his wounds, ensured his treatment at a local emergency room, referred him for further evaluation by an off-site specialist and ensured the completion of off-site specialty diagnostic studies.   The defendants submitted affidavits and relevant medical records in response to the complaint filed by Clark.[4]   The affidavits are corroborated by the objective medical records contemporaneously compiled during the treatment process.

Specifically, Defendant Dr. Ronald Herring, who was the Medical Director at Staton from July 22, 2015 until September 6, 2016, reviewed the pertinent medical records and testified by affidavit as follows:

> On May 9, 2016, at approximately 5:10 p.m. the correctional staff brought Mr. Clark to the Staton health care unit on a stretch following an altercation between Mr. Clark and one or more other inmates.   (COR 020, 045).   A member of Staton nursing staff examined Mr. Clark and performed an inmate body chart at the request of the correctional staff.  (COR 020). This nurse noted Mr. Clark as unresponsive. (COR 020).  The nurse detected bleeding and swelling on Mr. Clark's face around the orbital area and his lips, and a laceration to his is left upper lip.  (COR 020).  Both of his eyes appeared to be swollen shut.  (COR 020).  The nurse also noted abrasions to Mr. Clark's back.  (COR 020).
> I also evaluated Mr. Clark shortly thereafter at approximately 5:15 p.m.  (COR 038).  I also noted Mr. Clark to be unresponsive and identified

---

[4] Citations to the medical records in the defendants' affidavits reference the page numbers assigned these documents by the medical care provider.

significant head trauma with bilateral hematomas (collection of blood) over and around his eyes. (COR 038). I observed blood in Mr. Clark's mouth as well as the injures noted by the nurse. (COR 038). However, my examination also detected that Mr. Clark periodically moaned, moved his upper extremities and could breath on his own. (COR 038). The medical staff suctioned the blood out of Mr. Clark's mouth, and his airways appeared patent without obstruction. (COR 038). I also checked Mr. Clark's carotid pulse and found that it was palpable and regular. (COR 038). I concluded that Mr. Clark had suffered possibly severe head trauma and entered an order for the inmate to be transported to the emergency room in Jackson Hospital via ambulance for an urgent assessment and treatment. (COR 013, 038).

Mr. Clark left the facility via ambulance at approximately 5:25 p.m. that evening. To be clear, we evaluated Mr. Clark and ensured his transport to an off-site medical facility within a matter of minutes. (COR 042). There was no meaningful delay in my referral of Mr. Clark to the local emergency room.

Upon his arrival at Jackson Hospital's emergency room, the initial exam revealed a possible nasal fracture. (COR 092-105). The hospital staff undertook an extensive examination of Mr. Clark, although he was "uncooperative" with their efforts to examine him. (COR 092-105). The hospital staff cleaned Mr. Clark's lacerations, applied anesthesia and stitched the lacerations on his lip. (COR 092, 93). The staff also conducted a number of diagnostic tests and studies on Mr. Clark to assess his condition. (COR 101-02, 112-18). The resulted of an EKG administered by the hospital staff were normal. (COR 1010). Mr. Clark also underwent CT scans of his brain, face, chest, abdomen, pelvis and cervical lumbar spines. (COR 112-17). The scans indicated that Mr. Clark had a nasal fracture, hematoma (collection of blood) at his scalp, possible muscle spasms in his back and a non-obstructive kidney stone. However, the scans were otherwise normal and indicated no damaged to Mr. Clark's brain. (COR 113-17). Significantly, from the physical examination of Mr. Clark and the diagnostic studies, the hospital staff did not find any indications of a concussion or the need for any surgical intervention and concluded that his neurological functions were normal. (COR 094-95, 098-104, COR 113-17). Nasal fractures such as the one experienced by Mr. Clark that do not involve significant displacement typically do not require surgical intervention, and such fractures will usually heal by their own. By 8:05 p.m. on May 9, 2016, the medical staff at Jackson Hospital concluded that Mr. Clark's condition was "improved" and "stable" and that he could safely return to Staton. (COR 104).

Mr. Clark returned to Station from the emergency room at Jackson Hospital at approximately 10:30 p.m. on May 9, 2016. (COR 019). Upon his return, a member of the Staton nursing staff examined him and noted the swelling and lacerations on his face and back. (COR 047). The nurse's

examination found that Mr. Clark's eyes were swollen shut and that he could walk with assistance. (COR 047). The nurse did not detect any indications that he was in acute distress. (COR 047). He was awake at that time, and his vital signs were stable. (COR 019, 047). The medical staff placed him in the medical observation unit ("MOU") in bed number 17 for observation. (COR 047). Furthermore, the correctional staff also placed a hold on Mr. Clark for his personal safety following the altercation. (COR 047).

Members of the Staton nursing staff visibly checked Mr. Clark at least three (3) times during the course of the night of May 9, 2016, and early morning of May 10, 2016, following his return from the hospital. (COR 040). Th nurses examined his condition, noted his symptoms, cleaned his wounds and provided him with the pain medication ordered by providers on the medical staff. (COR 040).

On May 10, 2016, I entered an order for Mr. Clark to receive acetaminophen-codeine at 300 mg twice a day for three (3) days and ibuprofen (Motrin) at 400 mg three (3) times a day for seven (7) days for any discomfort. (COR 003-04).

When a member of the nursing staff checked on Mr. Clark at approximately 4:00 a.m. on May 11, 2016, the nurse found that this face and eyes were still swollen. (COR 040). Mr. Clark was not able to see out of his right eye but could see somewhat from his left eye. (COR 040). The nurse examined Mr. Clark and detected no nasal bleeding. (COR 040). Moreover, Mr. Clark reported no dizziness when he walked. (COR 040). The nurse administered Mr. Clark's pain medication to him. (COR 040).

Mr. Clark submitted a sick call request on May 13, 2016, requesting a renewal of his pain medication. (COR 035). In this sick call request, Mr. Clark expressed concerns and discomfort related to a broken nose, a possible concussion, wounds on his back and swelling in his hands and arms. (COR 035). The nursing staff responded to the sick call request that same day, and noted existing prescription for Motrin for discomfort. (COR 035).

By May 13, 2016, Mr. Clark's condition had improved significantly, and on or around that day the correctional staff decided to place Mr. Clark in a holding cell off a hallway in the Staton health care unit. (COR 040). Mr. Clark was still under an ADOC hold for his safety at that time. (COR 040). From a medical standpoint, moving Mr. Clark to the holding cell did not present any obstacle to his health or continued improvement.

On May 14, 2016, a member of the nursing staff, Myra McVay, examined Mr. Clark in the holding cell and found he was clam and cooperative. (COR 040-041). Mr. Clark was alert and oriented, and his breathing was even and unlabored. (COR 041). Nurse McVay's examination found that Mr. Clark was not in any acute distress. (COR 041).

The ADOC transferred Mr. Clark from Staton to Draper on May 16, 2016. (COR 052). At the request of the correctional staff, a member of the

Staton nursing staff performed a body chart on Mr. Clark on May 16, 2016. (COR 021). The nurse examined Mr. Clark and noted multiple healing abrasions with scabs on his back and shoulder. (COR 021). There was swelling and bruising around both of his eyes, and the nurse noted scabs in his nasal area. (COR 021).

Although in Mr. Clark's complaint, he appears to only complain about the medical care he received in May of 2016, it is important to note that the Staton medical staff continued providing him with appropriate, necessary medical care well after May 31, 2016, related to the injuries he sustained in the altercation on May 9, 2016.

A member of the nursing staff saw Mr. Clark on June 1, 2016, after he expressed concerns of back discomfort. (COR 047-048). The nurse examined Mr. Clark and found that his hand grips were strong, his posture was erect and his gait was symmetrical. (COR 048). Mr. Clark was alert and oriented at that time, and the nurse found no indications that he required emergent or urgent intervention. (COR 048-049).

On June 1, 2016, I prescribed ibuprofen at 200 mg for Mr. Clark to take twice a day for seven (7) days for any discomfort. (COR 005). A nurse practitioner on the Staton medical staff renewed the ibuprofen prescription on June 6, 2016 and prescribed 200 mg twice a day for seven (7) days through June 14, 2016. (COR 006).

On June 2, 2016, Mr. Clark submitted a sick call request expressing concerns about dizziness and an inability to keep his balance and voicing concern that May 9, 2016, altercation aggravated a concussion he suffered at Decatur Work Release in March of 2016. (COR 037).

A member of the nursing staff saw Mr. Clark at sick call on June 3, 2016, when he complained of dizziness, headaches, difficulty keeping his balance and seeing floaters. (COR 050). During the nurse's examination, Mr. Clark indicated that these symptoms started as far back as March 9, 2016. (COR 050). During the examination on June 3, 2016, the nurse completed a Glasgow Coma Scale to determine if Mr. Clark might be suffering from an impairment in alertness. (COR 050). The results of the score were normal. (COR 050). The nurse's examination found that Mr. Clark's gait was steady, that his verbal responses were appropriate, that he was able to obey commands and that he could open his eyes spontaneously. (COR 050). The nurse found no indications that Mr. Clark required urgent or emergent intervention a t that time. (COR 051). The nurse instructed Mr. Clark to follow up with a provider on the Staton medical staff if he continued to experience dizziness. (COR 051).

A member of the Staton nursing staff saw Mr. Clark on June 6, 2016. (COR 039). The nurse examined Mr. Clark and confirmed that his vital signs were stable. (COR 039). A nurse practitioner on the Staton medical staff saw Mr. Clark later that same day. (COR 039). Mr. Clark complained to the

nurse practitioner that in the May 9, 2016, altercation with other inmates, he had suffered sixteen (16) stab wounds and broken his nose. (COR 039).

The nurse practitioner evaluated Mr. Clark and noted that the report from the emergency room at Jackson Hospital referred to a nose fracture but did not mention any stab wounds. (COR 039). The nurse practitioner's examination observed bruising around both of Mr. Clark's eyes. (COR 039). The wounds on the inmate's back were healed, and the nurse practitioner's examination found no signs for symptoms of infection. (COR 039). Moreover, the examination detected no new deficits in Mr. Clark's physical condition. (Cor 039). The nurse practitioner concluded from his evaluation that Mr. Clark's nose fracture and stab wound were healing well. (COR 039). To address Mr. Clark's complaints of headaches and photosensitivity, the nurse practitioner provided him with a lay-in profile for one and a half weeks and ibuprofen to take on an as needed basis. (Cor 039). The nurse practitioner instructed Mr. Clark to utilize the sick call process if his symptoms had not improved in two (2) weeks. (COR 039).

Two weeks later, i.e. June 20, 2016, the nurse practitioner also provided Mr. Clark with a profile permitting him to avoid standing for more than (10) minutes that remained in effect through July 20, 2016. (COR 063).

That same day, the nurse practitioner submitted a request for Mr. Clark to receive approval for an evaluation by an offsite eye specialist for his continued complaints of dizziness, headaches and the spots in his vision. (COR 079-080). The nurse practitioner noted that the symptoms Mr. Clark reported to the medical staff appear to be consistent with a detached retina. (COR 079-080). The request for an evaluation by an offsite ophthalmologist was approved on June 21, 2016. (COR 079).

The evaluation by the offsite ophthalmologist took place on June 22, 2016. (COR 085). The eye specialist examined Mr. Clark, noted the nature of Mr. Clark's injuries from the May 9, 2016, altercation and the subsequent symptoms that Mr. Clark reported to the Staton medical staff. (COR 085). However, the ophthalmologist's examination detected on indications that Mr. Clark's left retina was detached. (COR085). The ophthalmologist reported back to the Staton medical staff that no follow-up evaluation was necessary. (COR 85).

On June 22, 2016, a nurse practitioner on the Staton medical staff completed a request for Mr. Clark to be sent offsite for a CT scan of his head, and I reviewed the request before its submission. (COR 081-082). The request noted that Mr. Clark had suffered multiple blows to his head and complained of dizziness, coordination and balance issues and slurred speech, even though recent examinations of Mr. Clark's eyes had determined that they were normal, his cranial nerves were intact, he exhibited a normal gait and the medical staff had detected no slurring of speech. (COR 081-082). The request for the CT scan was approved, and Mr. Clark underwent a CT

scan of his head at Jackson Hospital on July 14, 2015.  (COR 076-078).  The CT scan of Mr. Clark's head was normal.  (COR 076).  There were no indications of a fracture, hemorrhage or collection of blood.  (COR 076).

Providers on the Station medical staff saw Mr. Clark on multiple occasions when he expressed concerns about dizziness and seeing spots in his vision.  (COR 071, 070, 069).  For example, providers examined Mr. Clark on June 20, 2016, June 22, 20-16, July 8, 2016, July 11, 2016 and July 15, 2016.  (COR 069-071).  Notably, these examinations did not detect any signs or indications of an acute development in Mr. Cark's condition that would indicate he was suffering the symptoms of a concussion or other lingering complications from the altercation on May 9, 2016.  (COR 069-071).

Mr. Clark submitted a sick call request dated July 5, 2016, voicing concerns that he was still experience light-induced headaches, dizziness, and "white lights and blind spots" in his left eye.  (COR 074).  However, when a member of the nursing staff examined him on the following day and assess him for his complaints, the nurse detected normal eyes and found that he had 20/30 vision in his left eye, and 20/30 vision overall.  (COR 071-073).

Providers on the Staton medical staff continued prescribing Mr. Clark with medications to address his discomfort and any swelling he experienced, including prescriptions dated June 6, 2016, June 20, 2016, July 8, 2016 and July 15, 2016. (COR 064-068).

On July 15, 2016 a nurse practitioner provided Mr. Clark with a profile restricting him from standing for more than thirty (30) minutes that was valid through August 15, 2016. (COR 062).

Mr. Clark's allegation in his complaint that he suffered broken teeth in the May 9, 2016, altercation for which he did not receive treatment is both incorrect and baffling.  His medical records contain no sick call request following the May 9, 2016, altercation with regard to his teeth or complaining that he suffered broken teeth in the altercation.  Moreover, only a few days after he filed this lawsuit, he received an annual examination by the dental staff on June 9, 2016.  (COR 087-088).  Although the dentist's examination of Mr. Clark on June 9, 2016, observed that there were slight breaks on the incisional edges of two (2) of Mr. Clark's teeth, the dentist noted that these two (2) teeth were asymptomatic, that is, Mr. Clark did not report experiencing any pain or discomfort from these teeth.  (COR 075).

Mr. Clark's complaint that the Staton medical staff provided him with inadequate medical care because his stitches were not removed earlier is equally groundless.  Prior to June 1, 2016, that is, when Mr. Clark filed this lawsuit, he never submitted a sick call request indicating his stitches cause him any medical distress or requesting that the medical staff remove his stitches.  Mr. Clark never complained to the medical staff of any complication related to his stitches.  However, when Mr. Clark's lacerations

18

were healed, the medical staff did remove the stitches, although after he filed this lawsuit. (COR 071).

There is also no factual basis for Mr. Clark's speculation that I and Nurse Lyndia Likely were somehow responsible for the correctional staff placing him in a holding cell between May 13, 2016 and May 16, 2016. I absolutely deny this allegation. As a general rule, the correctional staff at Staton is responsible for ordering inmates to be housed in holding cells. I was not involved in any way whatsoever with placing Mr. Clark in a holding cell in May of 2016. I did not make any decision, enter any order or take any action whatsoever relating in any way to the placement of Mr. Clark in a holding cell. Moreover, to my knowledge, no member of the medical staff or correctional staff denied Mr. Clark access to a toilet, water, lights or a bed between May 13, 2016 and May 16, 2016.

Based upon my review of Mr. Clark's circumstances, I am confident that he has received an appropriate level of treatment. Furthermore, I cannot see any reason to conclude that the course of treatment Mr. Clark received was inappropriate in any way or that the conduct of the Staton medical staff fell below the standard of care of that provided by other similarly situated medical professionals. Given this course of treatment, in my professional medical opinion, the Staton medical staff acted appropriately in all respects. Again, based upon my review of Mr. Clark's medical records, I can state to a degree of medical certainty that the members of the medical staff at Staton fully satisfied the standard of care owed by them within the State of Alabama.

There is no evidence or objective data of any kind suggesting that Mr. Clark's condition changed, worsened or declined in any way as a result of the care he has received during his incarceration. Any allegation by Mr. Clark that he currently does not have access to the medical services available to him at Staton is simply untrue.

(Doc. 55-1 at pp. 1–12). The medical records further confirm that medical personnel at Staton evaluated Clark each time he appeared at sick call or medical appointments with complaints, assessed his need for treatment, prescribed medications to alleviate the pain associated with his condition when they deemed such necessary, issued medical profiles as warranted, and provided treatment to Clark accordance with their professional judgment. (Docs. 55-2 at pp. 1–61; 55-3 at pp. 1–58). Finally, the remaining medical defendants filed affidavits detailing the limited scope of their interactions with Clark and denying they acted

with deliberate indifference to his medical needs.  (Docs. 55-4, Sagers-Copeland Affid.; 55-5, Myra McVay Affid.; 55-6, Jannaye Talley Affid.; 55-7, Tara Parker Affid.; 55-8, Lyndia Likely Affid.; 55-9, Charlene DeJarnett Affid.; 55-10, Cebria Lee Affid).

In addition to the foregoing statements, the Medication Administration Record contradicts Clark's assertion that the defendants denied him medication for treatment of the pain associated with injuries received in the May 9, 2016 altercation.  Specifically, these records demonstrate that medical personnel prescribed Clark medications in an effort to alleviate the pain associated with his injuries.  On May 10, 2016, Dr. Herring entered an order for  Clark to receive acetaminophen-codeine at 300 mg twice a day for three (3) days and ibuprofen (Motrin) at 400 mg three times a day for seven days for any discomfort. (Doc 55-2 at pp. 4–5).  Thereafter, on June 1, 2016, Dr. Herring prescribed ibuprofen at 200 mg for Clark to take twice a day for seven days for any discomfort.  (Doc. 55-2 at p. 6).  A nurse practitioner on the Staton medical staff renewed the ibuprofen prescription on June 6, 2016 and prescribed 200 mg twice a day for seven days through June 14, 2016. (Doc. 55-2 at p. 7).  Providers on the Staton medical staff continued prescribing Clark with medications to address his discomfort and any swelling he experienced, including prescriptions dated June 6, 2016, June 20, 2016, July 8, 2016 and July 15, 2016. (Doc. 55-2 at pp. 4–5).

Moreover, it is undisputed that medical personnel issued profiles to Clark when they deemed his condition warranted such action.  Specifically, to address Clark's complaints of headaches and photosensitivity, on June 6, 2016, the nurse practitioner provided him with a lay-in profile for one and a half weeks and ibuprofen to take on an as needed basis.

(Doc. 55-2 at p. 40).  The nurse practitioner instructed Clark to utilize the sick call process if his symptoms had not improved in two weeks.  *Id.*  Two weeks later, on June 20, 2016, the nurse practitioner provided Clark with a profile permitting him to avoid standing for more than ten minutes that remained in effect through July 20, 2016.  (Doc. 55-3 at p. 4). Thereafter, on July 15, 2016, a nurse practitioner also provided Clark with a profile restricting him from standing for more than thirty minutes that was valid through August 15, 2016.  (Doc. 55-3 at p. 2).

With respect to Clark's specific complaints that defendants failed to respond to his grievances, he was not treated for broken teeth and his stitches were not removed in a timely manner, the records show that these complaints are baseless.   First, concerning the grievance response, Defendant Michele Sagers-Copeland, Health Services Administrator at Staton, testified by affidavit as follows:

> During the course of his incarceration at Staton and Draper, Mr. Clark submitted four (4) Medical Grievances and one (1) Medical Grievance Appeal.  (COR 56-59, 090).  One of the Medical Grievances and the Medical Grievance Appeal contain similar complaints to those Mr. Clark alleges in this lawsuit, although the Medical Grievance Appeal is dated June 1, 2016, and the Staton medical staff did not actually receive the Medical Grievance Appeal until June 2, 2016.  (COR 056-059).   Contrary to Mr. Clark's allegations, I provided a written response to all of the grievance forms that, as was appropriate for each case, clarified his misunderstanding regarding his medical care, reminded him on how to obtain his medication or instructed him on how to properly utilize the procedures for obtaining medical care. (COR 056-059, 090).

(Doc. 55-4 at ¶ 16).  The Court has independently reviewed the supporting grievance documents and concludes that Defendant Sagers-Copeland responded to all of Clark's grievances and advised him how to obtain medication refills, explained the grievance

procedure, ensured Clark was seen by the medical provider and refunded his money for a sick call visit.  (Doc. 55-2 at pp. 57–60; Doc 55-3 at p. 30).

Second, concerning Clark's teeth, Dr. Herring testified by affidavit as follows:

His medical records contain no sick call request following the May 9, 2016, altercation with regard to his teeth or complaining that he had suffered broken teeth in the altercation.  Moreover only a few days after he filed this lawsuit, he received an annual examination by the dental staff on June 9, 2016.  (COR 087-088).  Although the dentist's examination of Mr. Clark on June 9, 2016, observed that there were slight breaks on the incisional edges of two (2) of Mr. Clark's teeth, the dentist noted that these two (2) teeth were asymptomatic, that is, Mr. Clark did not report experiencing any pain or discomfort from these teeth.  (COR 075).

(Doc. 55-1 at ¶ 33).  The Court has independently reviewed the supporting medical records and concludes that Clark's dental records support Dr. Herring's testimony.

Third, concerning the removal of Clark's stitches, Dr. Herring testified by affidavit as follows:

Prior to June 1, 2016, that is, when Mr. Clark filed this lawsuit, he never submitted a sick call request indicating his stiches caused him any medical distress or requesting that the medical staff remove his stitches.  Mr. Clark never complained to the medical staff of any complication related to his stitches.  However, when Mr. Clark's lacerations were healed, the medical staff did remove the stitches, although after he filed this lawsuit.  (COR071).

(Doc. 55-1 at ¶ 34).  The Court has independently reviewed the supporting medical records and concludes that Clark's medical records support Dr. Herring's testimony.  Moreover, the medical records reflect that on June 22, 2016, the medical provider who removed the stitches noted "Skin well healed. 1 suture removed, no complication and Mr. Clark tolerated the procedure very well."  (Doc.  55-3 at p. 11).

Under the circumstances of this case, the court concludes that the course of treatment undertaken by the medical staff at Staton did not violate Clark's constitutional rights. Specifically, there is no evidence upon which the court could conclude that any member of the medical staff who provided treatment to Clark acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505. Rather, the evidence before the court demonstrates that medical personnel, including the nursing staff and site physicians, examined Clark following the May 9, 2016 altercation, prescribed medications to Clark in an effort to treat his pain, treated his wounds, ensured his treatment at a local emergency room, referred him for further evaluation by an off-site specialist and ensured the completion of off-site specialty diagnostic studies. (Doc. 55-1 at ¶¶ 4–37; COR 003–06, 019–118). Whether medical personnel "should have [utilized] additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted). In addition, to the extent Clark complains that his physicians should have allowed continuous prescriptions for pain relievers or pursued a mode of treatment other than that prescribed, this allegation does not "rise beyond negligence to the level of [deliberate indifference]." *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1505 (holding that inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (holding that simple divergence of

opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

As a result, the court concludes that the alleged lack of medical treatment did not constitute deliberate indifference. Clark's self-serving statements of a lack of due care and deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records. *Whitehead*, 403 F. App'x 401, 403 (11th Cir. 2010); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013) (same). In addition, Clark has failed to present any evidence showing that the manner in which the medical defendants addressed his condition created a substantial risk to his health that the attending health care personnel consciously disregarded. The record is therefore devoid of evidence—significantly probative or otherwise—showing that any medical professional acted with deliberate indifference to a serious medical need experienced by Clark. Consequently, summary judgment is due to be granted in favor of the medical defendants.

### 3.    Correctional Defendants.

To the extent Clark argues that the Correctional Defendants acted in a manner to prevent him access to treatment from professional medical personnel while incarcerated in the state prison system, the Court concludes that this argument lacks merit. Indeed, it is clear from the medical records that the correctional defendants were not in any way

involved in decisions regarding the medical treatment provided to Clark as these decisions are made solely by healthcare professionals employed by Corizon.

Clark has failed to establish deliberate indifference on the part of the correctional defendants.  Specifically, Clark has not demonstrated that these defendants were aware of facts establishing "an objectively serious medical need" nor that these defendants disregarded any known serious risk to Clark's health.  *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).  Consequently, summary judgment is due to be granted in favor of the correctional defendants on Clark's claim alleging deliberate indifference arising from the actions of medical personnel in treating his pain.

Insofar as Clark seeks to hold the correctional defendants liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be brought against managing officers of a prison absent allegations that they were personally connected with the alleged denial of treatment). Moreover, "supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care. *See, e.g., Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849

F.2d 322, 327 (8th Cir. 1988)." *Williams v. Limestone County, Ala.,* 198
Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

Even assuming *arguendo* that the correctional defendants exerted some control over

the manner in which those persons responsible for the provision of medical treatment

rendered such treatment, the law is well settled "that Government officials may not be held

liable for the unconstitutional conduct of their subordinates [or co-workers] under the

theory of *respondeat superior* [or vicarious liability]. . . .  A public officer or agent is not

responsible for the misfeasances or position wrongs, or for the nonfeasances, or

negligences, or omissions of duty, of the subagents or servants or other persons properly

employed [alongside,] by or under him, in the discharge of his official duties.  Because

vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each

Government-official defendant, through the official's own individual actions, has violated

the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotation marks,

citation and parentheses omitted); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)

(holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts

of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh,*

268 F.3d at 1035 (holding that a supervisory official "can have no respondeat superior

liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003)

(concluding supervisory officials are not liable on the basis of respondeat superior or

vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (holding that

42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the

actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S. Ct. 1949. Thus, liability for actions of the correctional defendants could attach to the other named defendants only if these defendants "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

The record is clear that the correctional defendants did not personally participate or have any involvement, direct or otherwise, in the medical treatment provided to Clark. The evidentiary materials before the court demonstrate that medical personnel made all decisions relative to the treatment provided to Clark and provided treatment to him in accordance with their professional judgment upon assessment of his physical condition.

In light of the foregoing, the correctional defendants can be held liable for decisions of medical personnel only if they undertook actions which bear a causal relationship to the purported violation of Clark's constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the correctional defendants, Clark must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from

doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Clark has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that the correctional defendants directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop such action.  In addition, Clark has presented no evidence of obvious, flagrant or rampant abuse of continuing duration regarding his receipt of medical treatment in the face of which these defendants failed to take corrective action; instead, the undisputed medical records indicate that Clark had continuous access to medical personnel and received treatment for his pain.  The undisputed records also demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by the correctional defendants.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified.  *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987).

For the foregoing reasons, summary judgment is likewise due to be granted in favor of the correctional defendants with respect to liability based on the theory of *respondeat superior*.  Furthermore, even had Clark presented a proper basis for the claims lodged against the correctional defendants, the evidentiary materials before the court, including Clark's medical records, demonstrate that health care personnel did not act with deliberate indifference to his medical needs.

### C.     Deliberate Indifference — Challenge to Conditions

Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).   The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id*. at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" and "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted).   Prison conditions which may be "restrictive and even harsh, are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment.  *Id*.  Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345–46.  Although "[t]he Constitution 'does not mandate comfortable prisons' . . . neither does it permit inhumane ones[.]" *Farmer*, 511 U.S. at 832 (quoting *Rhodes*, 452 U.S. at 349).  Thus, a prisoner's conditions of confinement are subject to constitutional scrutiny.  *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32.  For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to

[the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289–90 (11th Cir. 2004).  As with deliberate indifference claims, to demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834.  The court previously identified the applicable standard relevant to establishment of the objective and subjective elements of an Eighth Amendment claim. *See supra*. at 5–6.

The living conditions within a correctional facility will constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes,* 452 U.S. at 347.  "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities.  Such conditions could be cruel and unusual under the contemporary standard of decency. . . .  But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 347.  In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards. *Hamm v. De Kalb County*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986); *see Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991).

The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when

they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. . . .  To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes.  Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991) (emphasis in original).

As previously noted, a prison official may likewise be held liable under the Eighth Amendment for acting with deliberate indifference to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. at 828.  "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation marks omitted).  As the foregoing makes clear, mere negligence "does not justify liability under section 1983[.]" *Id*.

Clark claims that from May 13, 2016, until May 16, 2016, he was "locked in a room in Staton C.F. Health Unit . . .  and there was no toilet, water, lights nor bed.  I had to piss in cups and on the wall, floors, and I had to deficate in a brown paper sack."  (Doc. 1 at p. 3).  The correctional defendants adamantly deny these allegations.[5]  Indeed, the undisputed

---

[5] Although Clark alleges that medical defendants Dr. Herring and Nurse Likely were also responsible for his placement in this cell, the undisputed evidence shows that the correctional defendants were generally responsible for Clark's placement (Doc. 55-1 at ¶ 35) and that Warden Crow ordered Clark's placement in Hallway cell #1 following his release from MOU and the validation of his status as an enemy of the two inmates with whom he fought on May 9, 2016.  (Doc. 48-3 at p. 2).

evidence shows that Hallway cell #1, where Plaintiff was confined from May 13, 2016 until May 16, 2016, had a commode and running water. (Doc. 48-3 at pp. 2–3).  The undisputed evidence further shows that correctional officers asked Clark if he needed to use the restroom a number of times during this period. (Doc. 48-8; Doc. 50-1).  Even so Correctional Officer Wingrove testified by affidavit that on May 14, 2016, "[i]nmate Clark had already made the mess in the Cell when I entered.  I cleaned up the mess.  I had the jug brought in because I wanted him to use the jug in case he couldn't make it to the toilet in time." (Doc. 50-1 at p. 2).  The plaintiff's allegations make clear that he complains about a limited period of time when his health may have limited his ability to timely reach the toilet and which he alleges resulted in his exposure to his own waste.  The question before the Court on summary judgment is whether the frequency and the duration of the alleged deprivations are serious enough to establish an Eighth Amendment violation.  *Grimes v. Thomas,* 2014 WL 554700 *5–7 (N.D. Ala. 2014). (No Eighth Amendment violation where due to installation of a flushing device, Plaintiff's toilet regularly contained his cellmate's feces and urine and Plaintiff had to choose between waiting an hour or more to flush the toilet or to use the polluted toilet and have his cellmate's waste splash on him).

Indeed, Eighth Amendment violations "typically require the presence of intolerable conditions, far worse than those Plaintiff alleges."  *Id.* at *7 (collecting cases); *See McCord v. Maggio*, 927 F. 2d 844, 848 (5th Cir. 1991) (Finding Eighth Amendment violation where a prisoner was forced to live and sleep for two years in an unlit cell with sewage backup and roach infestation); *McBride,* 240 F. 3d at 1292 (Finding Eighth Amendment violation where inmate was forced to remain in a feces-covered cell for three days); *DeSpain v.*

*Uphoff,* 264 F. 3d 965, 974 (10th Cir. 2001) (Finding Eighth Amendment violation where, for thirty-six hours, after a riot the water overflowed to standing depth of four inches and prisoners urinated into the water where feces and uneaten food floated.) However, the Eleventh Circuit has recognized the existence of an Eighth Amendment violation where the plaintiff alleged "he was denied the ability to use the bathroom or clean himself for a full two days" and "he was 'forced to lie in direct and extended contact with this own feces without the ability to clean himself, while confined to a hospital bed in maximum security constraints." *Brooks v. Warden Powell*, 800 F.3d 1295, 1305 (11th Cir. 2015).

*Brooks* is distinguishable on its facts from the instant case because Clark does not allege that he was made to lie in contact with his own feces without a manner to clean himself. To the contrary, the facts show that for three days Clark was housed in Hallway cell #1, which had a toilet and running water (Doc. 48-3 at p. 2), and the correctional officers repeatedly inquired about his need to use the restroom and assisted him. (Doc. 48-8; Doc. 48-10; Doc. 50-1). Nevertheless, Clark urinated on the walls and floor of Hallway cell #1 and correctional officer Wingrove cleaned up the mess and brought him a jug to use in case he could not make it to the toilet. (Doc. 48-8; Doc. 50-1). Assuming the truth of Clark's statement, which the Court must do on summary judgment, that he was forced to defecate in paper bag, the Court concludes that this single incident does not rise to the level of the conduct in *Brooks* where an inmate was shackled to his bed and forced to defecate in his jumpsuit without being cleaned for 2 days. Accordingly, the Court concludes that the plaintiff's allegations fail to satisfy the objective element of an Eighth Amendment

violation and summary judgment is therefore due to be granted on this claim. *Caldwell*, 748 F.3d at 1099.

### D.     Deliberate Indifference — Failure to Protect

Clark alleges that the correctional defendants acted with deliberate indifference to his safety by failing to protect him from an assault which occurred in D Dormitory on May 9, 2016. His claim is unavailing. "A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer,* 511 U.S. at 844–45. (internal quotations and citations omitted). Officials responsible for prison inmates may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's safety when the official knows that the inmate faces "a substantial risk of serious harm" and with such knowledge disregards the risk by failing to take reasonable measures to abate it. *Id*. at 828. A constitutional violation occurs only "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Cottone,* 326 F.3d at 1358. "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer,* 511 U.S. at 834. "Within [a prison's] volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of . . . the prison staffs and administrative personnel. . . . They are [also] under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). The Eleventh Circuit has, however, "stress[ed] that a 'prison

custodian is not the guarantor of a prisoner's safety." *Purcell ex rel. Estate of Morgan v. Toombs County*, *Ga.*, 400 F.3d 1313 (11th Cir. 2005) (quoting *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)). "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.' *Marsh,* 268 F.3d 1014 at 1028–29 (11th Cir. 2001) (en banc).'" *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). "In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation [under the Eighth Amendment], there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to a constitutional stature." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982).

Consequently, to proceed beyond the properly supported motion for summary judgment filed by the defendants, Clark must first demonstrate an objectively substantial risk of serious harm existed and "that the defendant[s] disregarded that known risk by failing to respond to it in an objectively reasonable manner." *Johnson v. Boyd*, 568 F. App'x 719, 721 (11th Cir. 2014), citing *Caldwell*, 748 F.3d at 1100. If he establishes these objective elements, Clark must then satisfy the subjective component. To do so, Clark "must [show] that the defendant[s] subjectively knew that [he] faced a substantial risk of serious harm. The defendant[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. (internal citation omitted).

> To survive a motion for summary judgment, a plaintiff must submit evidence that the defendant-official had subjective knowledge of the risk of serious harm. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). In

determining subjective knowledge, a court is to inquire whether the
defendant-official was aware of a "particular threat or fear **felt by [the]
[p]laintiff**." *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir.2003)
(emphasis added). Moreover, the defendant-official "must be aware of
specific facts from which an inference could be drawn that a substantial risk
of serious harm exists - and the prison official must also draw that inference."
*Id.* at 1349 (quotations omitted).).

*Johnston v. Crosby*, 135 F. App'x 375, 377 (11th Cir. 2005).

Clark alleges that on May 9, 2016, he was "beaten for over 10 to 20 mins. There
was only one officer assigned to the dorm that had over 200 inmates & (3) three bays and
C.O. Hill was outside." (Doc. 1 at p. 3). However, there is no evidence before the court
that "an objectively substantial serious risk of harm", *Farmer, 5*11 U.S. at 828, was posed
by the two inmates with whom Clark fought on May 9, 2016. Rather, the incident report
states as follows:

On May 9, 2016 at approximately 4:45PM, Correctional Lieutenant Jarmal
Sewell conducted a security check in D-Dormitory and observed inmate
Daniel Clark BM/194417 lying on the floor between beds D1-3A and D1-4A
with injuries to his head and facial area. Inmate Clark was escorted to the
Health Care Unit for a medical assessment. Lt Sewell conducted an
investigation into the incident and discovered inmate Clark was under the
influence of a narcotic and walking up to several unidentified inmates,
threatening to beat the inmates if anyone said anything to inmate Clark.
Inmate Clark approached Inmate Marcellus Goodwin BM/287933 and
swung at inmate Goodwin with his right hand. Inmates Goodwin and Clark
started fighting; inmate Anthony Young BM/269949 also began to fight with
inmate Clark.

(Doc. 51-1 at p. 2). Thus, the evidentiary materials indicate that Clark initiated the
altercation with inmates Goodwin and Young. Accordingly, the Court concludes that Clark
has failed to demonstrate the objective component necessary to establish deliberate
indifference.

Even if Clark had satisfied the objective component, his deliberate indifference claim nevertheless fails as he presented no evidence that the defendants were subjectively aware of any risk of harm to him posed by the other inmates.  Specifically, Clark does not allege, and the evidentiary materials do not indicate that he informed any correctional officers that Goodwin or Young had threatened him or presented any danger to him. *Johnson*, 568 F. App'x at 722 (holding that complaint properly dismissed for failure to state a claim because "[n]owhere does the complaint allege, nor can it be plausibly inferred, that the defendants subjectively foresaw or knew of a substantial risk of injury posed by [inmate-attacker]."); *Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) ("[W]e readily conclude the district court did not err by dismissing [Plaintiff's] failure-to-protect charge for failure to state a claim.  Simply put, the allegations of [Plaintiff's] complaint do not show the requisite subjective knowledge of a risk of serious harm, and, thus, do not state a claim for deliberate indifference resulting from a failure to protect. . . .  Put another way, because [Plaintiff] alleged no facts indicating that any officer was aware of a substantial risk of serious harm to him . . . and failed to take protective measures, his claim fails."); *Johnston*, 135 F. App'x at 377 (holding that defendants were entitled to summary judgment because Plaintiff provided no evidence that prison officials "had subjective knowledge of the risk of serious harm presented by [inmate attacker]" and "introduced no evidence indicating that he notified [the defendants] of any particularized threat by [his attacker] nor of any fear [he] felt [from this particular inmate]."); *see McBride v. Rivers*, 170 F. App'x 648, 655 (11th Cir. 2006) (holding that district court properly granted summary judgment to the defendants as Plaintiff "failed to show that the defendants had

subjective knowledge of a risk of serious harm" because plaintiff merely advised he "had problems" with fellow inmate and was "in fear for [his] life."); *Chatham v. Adcock*, 334 F. App'x 281, 293–94 (11th Cir. 2009) (Where Plaintiff did "not identif[y] any specific 'serious threat' from [fellow inmate]" or report any such threat to the defendants, mere "fact that [attacker] was a 'problem inmate' with 'violent tendencies' simply 'does not satisfy the subjective awareness requirement.'").   In light of the foregoing, summary judgment is due to be granted in favor of the correctional defendants on the claim alleging they acted with deliberate indifference to Clark's safety.

## IV.   CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.     The Defendants' motion for summary judgment be GRANTED.

2.     Judgment be GRANTED in favor of the Defendants.

3.     This case be DISMISSED with prejudice.

4.     Costs be taxed against the plaintiff.

On or before **August 8, 2019** the parties may file objections to this Recommendation.   A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual

and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this the 25th day of July, 2019.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE